## PIERRE M. DUPRE *v.* ROBERT McCRIGHT, Executor.

The act of Congress passed in 1847, prohibiting the sale of any soldier's claim to military bounty land, prior to the issuance of the warrant, was intended to protect the soldier from improvident sales. If the soldier be satisfied with the sale he has made, the purchaser cannot refuse the payment of the price upon the ground of the illegality of the transaction. Even if the soldier disaffirmed the sale, he would be compelled to restore any portion of the price he may have received.

APPEAL from the Fifth District Court of New Orleans, *Buchanan,* J. *T. W. Collins,* for plaintiff. *G. B. Duncan,* for defendant. The judgment of the court was pronounced by

PRESTON, J. The plaintiff claims a thousand dollars, being the balance of the price of fifteen soldiers' discharges, or warrants for bounty land, earned by them by military services, during the late war with Mexico. He alleges, that his assignor, *Joseph Gorman,* sold them to the late *William D. McCright* for fifteen hundred dollars, of which a thousand dollars remains unpaid.

The defendant filed a general denial. Although there was no plea to that effect, the district court dismissed the suit, on the ground that all traffic in soldiers' discharges is forbidden by law ; and, therefore, that there was no legal consideration for the sale, even if it existed.

*John Kayser* proves, that *Gorman* was a runner for the deceased *McCright,* to procure soldiers' discharges and warrants. The witness was employed by the latter to write for him, and says, the runners made more than the clerks. He proves that *McCright* paid *Gorman* at his office, in his presence, $200, and asked him if he wanted more, and said he still owed him about thirteen hundred dollars.

*Joseph Bellow* proves, that he was present eight or ten days before *McCright's* death, when he paid *Gorman* two hundred dollars, and said there was a thousand dollars still left. He knows that *Gorman* acted for *McCright* in purchasing soldiers' warrants.

*Edward Earle* was in in *McCright's* office about a week before his death, when he and *Gorman* were making a settlement about land-warrants, and heard *McCright* state that he owed him about a thousand dollars, and requested him to come the next week and he would pay him. He knew that *Gorman* had money and was a runner for *McCright.*

These witnesses were subjected to a very rigid cross-examination ; but we do not see anything elicited to discredit their evidence. It is true, the most material part of their testimony is to admissions merely of *McCright,* which, undoubtedly, is the weakest kind of evidence. But we are unable to conclude that these three men have all sworn falsely ; and without so doing it is impossible to come to any other conclusion than that the deceased did admit the indebtedness now claimed, to the amount of a thousand dollars, shortly before his death.

This indebtedness grew out of sales, made to the deceased, of the claims of soldiers for bounty lands. Neither the petition nor the testimony shows clearly whether the claims sold consisted of the certificates of the discharge of the soldiers, upon which claims to bounty land were founded, or the warrants for the land issued upon such certificates.

The 9th section of the act of Congress passed in 1847, giving bounty lands to our soldiers for services in the Mexican war, declared that " all sales, mortgages or other instruments of writing, going to affect the title or claim to any bounty right made or executed prior to the issue of such warrant or certificate, shall be null and void to all intents and purposes whatsoever."

This clause in the act evidently had two objects in view. 1st. To protect the soldier and his family against improvident dispositions of his bounty land ; and 2d. To protect the Government against any claim but that of the soldier.

Upon the return of our army from Mexico, there is no doubt the improvidence of many of the soldiers placed them in the most necessitous circumstances, in which a small amount of money was of far more service to them than all the land due to them by the Government. The forms, too, of obtaining the land occasioned delay and trouble, which their necessities could not brook. Therefore, they disposed of their certificates of service and discharge, giving a power of attorney to comply with the forms for obtaining their warrants, and to sell the same. Speculators purchased in this manner, with a perfect knowledge that the soldier might repudiate the transaction, but entire confidence that he would not do so, or if he did, under the belief that the purchaser would have a personal claim against the soldier for the money advanced. And thus the soldiers' claims became articles of traffic in market, and the evidences of them have been purchased extensively by speculators, probably with great advantage to many of the soldiers reduced to the most distressing poverty, at a distance from their homes. No law forbids the traffic in the evidences of these claims between third persons, and there is no reason for annulling the transactions between them, which were made with a perfect knowledge of the provisions of the law, and all the risks that were to be incurred. Good faith should exist and be enforced between those whose transactions do not fall within the policy of the law.

There is nothing immoral or improper in the purchase of the soldier's claims from the soldier himself. The law merely affords him and some of his heirs protection against improvident contracts. The contract against which he is protected is neither *malum per se* nor fraudulent. A mere personal privilege is accorded to him and some of his heirs to repudiate his contract, of which they may or may not avail themselves, as they think proper. And we have no hesitation in saying further, that if money was advanced to the soldier, by way of payment in a sale, or for mortgage, pledge or in any other manner upon his certificate of discharge, and he should afterwards, under the act of Congress, claim the nullity of the transaction, the courts would hold him personally accountable for the money actually paid or advanced to him. It would be a case to which the equity of article 1787 of our code would apply so forcibly that it could not be disregarded.

The defendant himself has not plead that the transactions of his deceased brother with *Gorman* were illegal, much less immoral, but merely denies any indebtedness growing out of those transactions. The record shows no opposition of the soldiers, or their heirs, to the titles to the land or money, the reward of their services ; and we are bound to believe from the evidence that the estate

DUPRE
v.
McCRIGHT.

of the deceased is actually enriched to the extent of the value of the claims purchased. The plaintiff, who is assignee of the vender, should recover the balance of the price of the sales.

It is therefore decreed, that the judgment of the district court be reversed, and that the plaintiff recover from the defendant one thousand dollars, with interest from the judicial demand, and costs in both courts.